

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ACUMEN RE MANAGEMENT
CORPORATION,

                Plaintiff,

   -v-

GENERAL SECURITY NATIONAL
INSURANCE COMPANY,

                Defendant.

MEMORANDUM DECISION
AND ORDER

09 CV 01796 (GBD)

**GEORGE B. DANIELS, District Judge:**

Acumen RE Management Corporation brought this action against General Security

National Insurance Company (hereinafter, "GSNIC" or "Defendant"), arising from a dispute

over what, if any, commission payments Defendant owed Plaintiff based upon the profitability of

reinsurance contracts underwritten by Plaintiff.[1]  Plaintiff initially asserted claims for breach of

contract and breach of the implied covenant of good faith and fair dealing, but only the breach of

contract claims remain.  See Docket # 40.  Plaintiff moved for partial summary judgment on

liability pursuant to Fed. R. Civ. P. 56(c).  Defendant also moved for summary judgement

dismissing the claim pursuant to Fed. R. Civ. P 56(c).  Defendant's motion for summary

judgment is GRANTED with respect to the quarterly reports, IBNR consultation, commutation

loss allocation, and carry forward deficit breach of contract claims, and DENIED with respect to

the data quality breach of contract claim.  Plaintiff's motion for summary judgment is DENIED

in its entirety.

---

[1]  Plaintiff originally named GSNIC's parent, SCOR U.S. Corporation, as a defendant.  See Docket # 1,
document # 4.  SCOR was dismissed from this action on April 9, 2009.  See Docket # 7.  The parties subsequently
stipulated to amend the caption as reflected above.  See Docket # 28.

## BACKGROUND[2]

### A.    REINSURANCE BUSINESS

Reinsurance is insurance that is purchased by insurance companies, and it often serves as a method of mitigating their exposure to risk.  Ex. 1, Deposition of Jonathan Beerman, at 26, 47-48; Ex. A, Workers' Compensation Reinsurance Concepts (hereinafter "Concepts"), at 1.  The company that agrees to indemnify an insurance company is called the "reinsurer."  Concepts, at 1.  The insurance company is called the "ceding insurer" or "reinsured."  Concepts, at 1.  Reinsurers often rely upon another party called the "underwriter" to assess the risks of a ceding insurer and determine a price for the ceding insurer's insurance policy.[3]  Concepts, at 1.  In the present litigation, Defendant provided reinsurance for workers' compensation insurers, and Plaintiff served as the underwriter on those policies.

There are two methods of reinsurance: facultative reinsurance[4] and treaty reinsurance.[5]  Concepts, at 1.  There are two methods of payment: pro rata[6] and non-proportional.[7]  Concepts, at 2.  The present litigation involves non-proportional facultative reinsurance.

There are two concepts central to the present litigation: IBNR and Commutation.  With

---

[2]  All exhibits are located in the Declaration of Mathieu J. Shapiro, unless otherwise stated.

[3]  Most reinsurers employ their own underwriters; however, with specialized insurance like workers' compensation, some reinsurers execute underwriting agreements with independent contractors.  Concepts, at 1.

[4]  Facultative reinsurance is based upon a specific insurance policy held by the ceding insurer.  Concepts, at 1.  The reinsurer will assume all or part of the risk assumed by the ceding insurer under a specific policy.  Concepts, at 1.  This reinsurance is thus negotiated separately for each insurance policy that is reinsured.  Concepts, at 1.

[5]  Treaty reinsurance, on the other hand, is based upon a type or category of risk assumed by the ceding insurer without regard to the specific insurance policy or policies from which the risk arose.  Concepts, at 1.  It does not involve a separate evaluation of each of the individual risks assumed by the reinsurer.  Concepts, at 1.

[6]  Under the proportional or pro rata approach, the reinsurer receives a stated percentage share of policy premiums and pays a stated percentage of losses incurred by the ceding insurer.  Concepts, at 2.

[7]  Under the non-proportional or excess of loss approach, the reinsurer pays only if the loss incurred by the ceding insurer exceeds a certain amount.  Concepts, at 2.  This amount is known as the retention point to the ceding insurer and the attachment point to the reinsurer.  Concepts, at 2.  This type of payment is typically slow and can continue over many decades.  Concepts, Ex. A, at 2.

respect to the first concept, every reinsurer has a statutory obligation to have reserves, or a

certain amount of assets available to meet all reasonably expected claims by the ceding insurer.

Concepts, at 2.  Reserves are reported as liabilities on the reinsurer's financial statements.

Concepts, at 2.  For non-proportional facultative reinsurance, the total amount of required

reserves is equal to a sum of: (a) Case Reserves, an estimate of the values of individual claims

reported by the ceding insurer but not yet paid by the reinsurer;[8] and (b) IBNR (or incurred but

not reported reserves),[9] an estimate of the expected values of outstanding case reserves and

unreported claims.  Concepts, at 3; Ex. 1, at 145, 148-149; Ex. 11, Deposition of Raji

Bhagavatula, at 31.

 With respect to the second concept, the parties can agree to an early termination of the

contract known as commutation.  Concepts, at 3; Affidavit of Jonathan Beerman ¶ 5.[10]  The

ceding insurer agrees to "take back" the risk for a mutually agreed upon one-time immediate

payment or settlement from the reinsurer.  Concepts, at 3-4; Ex. 1, at 45-46; Ex. 4, at 66;

Beerman Aff. ¶ 5.  The amount paid is the present value of the estimated ultimate losses

recoverable from the reinsurer (i.e. case reserve and IBNR), adjusted to account for uncertainty

as to how the business will ultimately develop.  Concepts, at 4; Ex. 4, at 68-69; Beerman Aff. ¶

6.  The reinsurer will list the commutation payment as a paid claim in its financial statements

---

[8] Case reserves are typically calculated by the ceding insurer, reported to the reinsurer, and recorded as reported by the reinsurer, though the reinsurer may make adjustments in its own judgment. Concepts, at 3.

[9] IBNR is calculated for reinsurers by actuaries. Concepts, at 3; Ex. 1, at 145.

[10] The negotiation of the commutation requires a financial and actuarial analysis of the book of business being commuted. Ex. 4, Deposition of Sarah Krutov, at 68-69.  The process of negotiating a commutation transaction includes, among other things: (1) a reconciliation exercise, under which the parties meet and agree to the subject matter of the commutation; (2) evaluation by the parties of their balances and reserves; and (3) the negotiation of a commutation price. Ex. 1, at 56-57, 62-63, 80, 82; Ex. 4, at 66-68, 230; Ex. 15, Deposition of Mary McCaffrey, at 33-34, 72, 77, 79-80; Beerman Aff. ¶ 5.

and eliminate any associated reserves (i.e. case reserve and IBNR) because liability from the contract has been extinguished.  Concepts, at 4; Ex. 1, at 47, 88-89, 97, 101, 111, 266, 269; Ex. 4, at 135, 281, 305, 315-316; Ex. 15, at 85, 231; Ex. 6, Deposition of Aaron Stern, at 71-72; Ex. 11, at 89; Beerman Aff. ¶ 5.

**B.     CONTRACTS AT ISSUE**

**1.     The Underwriting Agency Agreement or UAA**

In 1994, Plaintiff entered into the Underwriting Agency Agreement ("UAA") with Sorema North American Reinsurance Company, a reinsurer.  Ex. 7.   Under the UAA, Sorema appointed Plaintiff as its "exclusive non-employee excess workers' compensation facultative reinsurance underwriter."  Ex. 7, Art. I; Ex. 4, at 251; Ex. 8, Deposition of Jerome Faure, at 19. Plaintiff's "appointment and authority" "extend[ed] solely to underwriting and binding excess workers' compensation facultative reinsurance" pursuant to certain conditions.[11]  Ex. 7, Arts. II, III.  That is, Plaintiffs would assess the risks of an insurance policy, and, pursuant to certain specified requirements, would enter reinsurance agreements on behalf of Sorema.  These policies were evidenced and documented by Plaintiff-issued certificates, and collectively constituted Plaintiff's portfolio of business with Sorema.  Ex. 7, Art. III, ¶ C.  In exchange, Sorema paid Plaintiff a base compensation for its services, consisting of underwriting commissions as a percentage of premiums on Plaintiff's portfolio.  Ex. 7, Art. V, ¶¶ A and D, AcumenRe0001-0008.

---

[11]   The UAA also provided that:  (a) Sorema "always retain[ed] the right, to direct the termination of facultative certificates by [Plaintiff] or to terminate facultative certificates by direct notice to ceding companies or brokers," but "[Plaintiff] shall not make, permit, or cause general or indiscriminate cancellations, terminations or replacements of facultative certificates"; and (b) "[Plaintiff] ha[d] no authority to investigate, adjust, compromise, settle or pay any claims made on the facultative certificates written or bound un der this Agreement."  Ex. 7.

2.     **Contingency Commission Addendum or CCA**

Plaintiff and Sorema also executed the GSNIC Acumen RE Contingent Commission Addendum ("CCA") in 1994. See Ex. 10. The CCA entitled Plaintiff to receive a "contingency commission," equal to thirty percent (30%) of Sorema's annual net profits, if any, on the reinsurance certificates underwritten by Plaintiff. See Ex. 10, ¶ A. The CCA provided that "[t]he first contingent commission calculation for each Underwriting Year shall be performed by [Sorema] within two (2) months of the end of the fifth full calendar year after the end of the Underwriting Year under consideration for continent commission calculation," and that "[a] subsequent contingent calculation for each Underwriting Year shall be made in each subsequent calendar year until all liability for that Underwriting Year shall have expired." Ex. 10, ¶ D. The CCA specified a formula for the calculation of the contingent commission "by [Sorema] from its records from each Underwriting Year,"[12] including a requirement that the IBNR figure used in the calculation "be . . . established by [Sorema] after consultation with [Plaintiff]." Ex. 10, ¶ A.[13]

3.     **Termination Agreement**

SCOR acquired Sorema on July 31, 2001, and, effective January 1, 2002, the name of the company was changed from Sorema to GSNIC (i.e. the Defendant). Ex. 1, at 54, 78, 169; Ex. 4, at 74-75, 148; Ex. 13, Deposition of Maxine Verne, at 29-32. On May 1, 2002, Plaintiff and

---

[12] Under the formula, the net profits are derived by totaling the net written premiums for the Acumen produced business, and then subtracting from that amount certain allowable deductions, including losses and allocated loss adjustment expenses, outstanding case reserves and IBNR reserves, brokerage commissions, underwriting commissions, the cost of certain reinsurance, and overhead. Ex. 10, ¶ A, subparagraph 7. But before any commissions is due for any given underwriting year, Sorema is entitled to offset any commission payable by any deficit from the immediately proceeding Underwriting Year. Ex. 10, ¶ A, subparagraph 7.

[13] The CCA also provided that, where Sorema and Plaintiff "[did] not agree on the IBNR . . ., and the difference . . . exceed[ed] ten percent, the IBNR . . . shall be as recommended by a nationally recognized reputable actuarial consulting firm mutually agreed to by [Sorema] and [Plaintiff]." Ex. 10, ¶ F.

Defendant mutually agreed to terminate the UAA by executing the Agreement Terminating

Acumen Re Reinsurance Underwriting Agency Agreement ("Termination Agreement"). Ex. 19.

The Termination provided that certain provisions of the UAA survived termination of the UAA.

Ex. 19, ¶ 7.  In particular, the following provision of the former UAA is relevant to the present

litigation: "[Defendant] shall provide [Plaintiff] quarterly reports with a current report of

incurred loss on all outstanding claims." Ex. 7, Art. IV.

Defendant agreed to pay Plaintiff $1,000,000 as consideration for the early termination of

the Agreement. Ex. 19, ¶ 2.  Defendant also agreed to the following mechanism for calculating

Plaintiff's contingent commissions:[14] [15]

> (a)  The respective commissions for the 1997, 1998, 1999, 2000, 2001 underwriting years,
> and a prorated portion of the 2002 underwriting year (January 1 through April 30, 2002)
> shall be calculated and paid as set forth in the Contingency Commission Addendum to the
> Underwriting Agreement; provided, however, that the contingent commission calculations
> shall be made individually for each respective underwriting year between January 1, 2008
> and February 29, 2008.
>
> (b)  Except for any contingent commissions calculated in accordance with Section 3(a)
> above, no contingent commission for any underwriting year will be due to the Underwriter
> from [GSNIC].

Ex. 19, ¶ 3, AcumenRe0035-0036.

## C.     PRESENT DISPUTE

After SCOR acquired Sorema-turned-Defendant, some of the business segments were

unprofitable. Ex. 15, at 37, 45, 147; Ex. 16, at 63-65.  One of the steps taken to reduce losses

was commuting a portion of its book of business. Ex. 15, 39, 47; Ex. 30, Deposition of Andrew

---

[14]  It is undisputed that the parties intended to have the contingent commission for each underwriting year
calculated "on its own" – that is, separately or individually.  Ex. 14, at 77, 92-93, 95-96; Ex. 20, May 31, 2002 E-
mail from John Andrews, at GSNICHC0136; Ex. 19, at AcumenRe0035-41; Appendix of Undisputed Facts
Admitted by GSNIC, ¶ 53.  The extended period of time between the Termination Agreement and the calculation of
the contingent commission was expressly to permit enough time for the claims to develop, to become more certain,
and to permit a "better view of the ultimate result" and a "fairer calculation" of the contingent commission. Ex. 8,
Deposition of Jerome Faure, at 41, 43, 45.

[15]  It is undisputed that the parties never discussed commutation. Ex. 8, at 38-39, 77; Ex. 14, at 41.

Flasko; Ex. 31, October 30, 2003 E-mail from John Verbich to Mark Tricarico; Ex. 32,

November 5, 2003 E-mail from Wayne Keebler to Mark Tricarico and John Verbich. Between

July 2004 and December 2007, Defendant completed four commutation transactions on a

contract, rather than claim-specific, basis.[16]  Ex. 1, at 84-85, 131; Ex. 4, 304-305, 308; Ex. 15, at

83, 102-103.  Certificates underwritten by Plaintiff represented "a fraction" of the commuted

business, but a substantial portion of Plaintiff's income-deriving business with Defendant.  Ex. 1,

at 84-85, 186; Ex. 4, at 131-132, 236-237, 308; Ex. 15, at 83, 99, 102-103; Ex. 11, at 87-88, 104-

105; Ex. 2, at 39, 447-449.  Defendant did not consult with Plaintiff prior to completing these

transactions, though the potential impact on Plaintiff was considered by certain personnel.  Ex.

14, at 41; Ex. 2, 186-187, 314, 447-448; Ex. 4, at 296.

 After each commutation, Defendant allocated the losses without differentiating between

Plaintiff-produced certificates and the rest of the commuted policies – that is, according to

Defendant, losses were attributed based on a proportional application of the settlement payment

in proportion to the reserve carried on the contracts at the time of the commutations.[17]  Ex. 1, at

261-62; Ex. 4, at 135-136, 138, 140, 288-289; Ex. 15, at 83, 127-128, 222-224; Ex. 11, at 95.

Defendant also stopped providing Plaintiff with quarterly reports.  Ex. 6, at 37-38; Ex. 3, ¶¶ 40,

44; Appendix of Undisputed Facts Admitted by GSNIC, ¶ 57.

 In January 2008, Defendant undertook steps to perform the contingency commission

calculation to determine commissions potentially due to Plaintiff for the underwriting years

---

[16] Defendant's actuarial department calculated projected IBNR and net present value of reserves for those commutations based on the claims data in Omega, Defendant's data system.  Ex. 1, at 80, 89, 145, 147; Ex. 4, at 68; Ex. 15, at 126-127; Ex. 4, at 30, 34, 114-116, 141-143, 145.

[17] Defendant never determined how much was paid on the commutations specifically for the Acumen book of business, nor did it record the commutations on an individual claim business.  Ex. 4, at 291; Ex. 1, at 131.  This was unlike the typical procedure, as non-proportional treaties and facultative certificates require individual reporting of claims while proportional treaties require aggregate reporting.  Ex. 4, at 34, 35, 36.

1997, 1998, 1999, 2000, 2001, and the prorated portion of 2002.  Ex. 1, at 115, 198-201;

Beerman Aff. ¶ 13.  Defendant's calculation ultimately revealed that there were no net profits in

any of the underwriting years 1997 through 2002.  Beerman Aff. ¶ 5; Beerman Aff., Ex. 1.

Defendant found that Plaintiff's book of business generated underwriting losses in excess of

$56.7 million, with over $47 million representing outside case reserves and IBNR on non-

commuted Plaintiff produced business.  Ex. 1, at 48, 281; Beerman Aff. ¶¶ 16-17; Beerman Aff.,

Ex. 1.

## STANDARD OF REVIEW

Summary judgment is appropriate where the evidence, viewed in the light most favorable

to the non-moving party, shows "that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  Vacold. L.L.C. v. Cerami, 545

F.3d 114, 121 (2d Cir. 2008).  The burden of proof rests upon the moving party to show that no

genuine issue of material fact exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

A "material" fact is one that will affect the outcome of the suit under governing law.  Anderson

v. Liberty Lobby, Inc, 477 U.S. 242, 248 (1986).  For there to be a "genuine" issue of material

fact, the evidence must be such "that a reasonable jury could return a verdict for the non-moving

party."  Id.  In determining whether there is a genuine issue of material fact, the court is required

to resolve all ambiguities and draw all inferences in favor of the non-moving party.  See Sec. Ins.

Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

## BREACH OF CONTRACT CLAIMS

New York law governs the present dispute.[18]  Under New York law, "a breach of contract

---

[18]   The contracts at issue indicate that New York law should govern their interpretation and enforcement.
See Ex. 7, Art. XVI. E; Ex. 19, ¶ 14.  See Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) ("As a general
rule, choice of law provisions are valid and enforceable in New York.") (citing Marine Midland Bank, N.A. v.

claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011) (citing First Investors Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998); Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)).   Plaintiff claims that Defendant breached the presiding contractual agreements in several ways by: (1) not providing quarterly financial reports to Plaintiff; (2) failing to maintain adequate records from which to calculate profits and contingency commissions; (3) failing to consult with Plaintiff prior to establishing IBNR for contingency commission calculation; (4) using losses from the commutation transactions in the contingency commission calculation; and (5) using prior year deficits in the contingency commission calculation.  Defendant's conduct is mostly undisputed, and thus the dispositive issues are whether Defendant's conduct constitutes a breach of the Termination Agreement and/or certain provisions of the UAA, and, if so, whether Plaintiff incurred any damages as a result of the breach.

"A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." Brad H. v. City of New York, NY Slip Op 5543, at *4 (N.Y. June 28, 2011).  "[A] motion for summary judgment may be granted in a contract dispute . . . when the contractual language . . . is found to be wholly unambiguous and to convey a definite

---

United Missouri Bank, N.A., 643 N.Y.S.2d 528, 530 (N.Y. App. Div. 1996).  Moreover, the parties agree that New York law applies to the questions raised by these motions.  See Motorola Credit Corp. v. Uzan, 388 F.3d 39, 61 (2d Cir. 2004) ("Here, the parties' briefs assume that New York law controls this issue, and such implied consent is sufficient to establish choice of law." (internal quotation marks and alteration omitted)); American Fuel Corp. v. Utah Energy Dev. Co., Inc., 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry."); see, e.g., JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009).

meaning."[19] <u>Topps Co. v. Cadbury Stani S.A.I.C.</u>, 526 F.3d 63, 68 (2d Cir. 2008) (citing

<u>Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner &</u>

<u>Smith Inc.</u>, 232 F.3d 153, 157 (2d Cir. 2000)).  "The matter of whether the contract is ambiguous

is a [threshold] question of law for the court."  <u>Law Debenture Trust Co. of New York v.</u>

<u>Maverick Tube Corp.</u>, 595 F.3d 458, 465 (2d Cir. 2010); <u>Garza v. Marine Transport Lines, Inc.</u>,

861 F.2d 23, 27 (2d Cir. 1988).

 Ambiguity is determined from the face of the contract, not in light of extrinsic evidence

or the parties' previous dealings.  <u>See</u> <u>Doe v. Pataki</u>, 481 F.3d 69, 81 (2d Cir. 2007) (citations

omitted).  Ambiguity "exists where the terms of the contract could suggest more than one

meaning when viewed objectively by a reasonably intelligent person who has examined the

context of the entire integrated agreement and who is cognizant of the customs, practices,

usages, and terminology as generally understood in the particular trade or business."  <u>Law</u>

<u>Debenture Trust</u>, 595 F.3d at 466 (quoting <u>International Multifoods Corp. v. Commercial Union</u>

<u>Insurance Co.</u>, 309 F.3d 76, 83 (2d Cir. 2002)) (internal quotation marks omitted); <u>accord</u> <u>Bank</u>

<u>of N.Y.</u>, 607 F.3d at 914 (citing <u>Morgan Stanley Group Inc. v. New Eng. Ins. Co.</u>, 225 F.3d 270,

275 (2d Cir. 2000)); <u>see also</u> <u>Law Debenture Trust</u>, 595 F.3d at 467 ("[T]he court should not find

the contract ambiguous where the interpretation urged by one party would 'strain [] the contract

language beyond its reasonable and ordinary meaning.'" (quoting <u>Bethlehem Steel Co. v. Turner</u>

---

[19] "Summary judgment is generally inappropriate where the contested contractual language is ambiguous." <u>Bank of N.Y. v. First Millennium, Inc.</u>, 607 F.3d 905, 914 (2d Cir. 2010) (citing Palmieri v. Allstate Ins. Co., 445 F.3d 179, 187 (2d Cir. 2006)); <u>see also</u> <u>New York Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.</u>, 599 F.3d 102, 115 (2d Cir. 2010) ("Although a determination that a contract is ambiguous ordinarily requires denial of summary judgment, the court may nonetheless grant summary judgment where the extrinsic evidence illuminating the parties' intended meaning of the contract is "so one-sided that no reasonable person could decide to the contrary. Similarly, summary judgment may be granted despite any ambiguities in the contract "where there is no extrinsic evidence that would support a resolution of [the] ambiguities in favor of the nonmoving party's case.") (quoting Topps Co., 526 F.3d at 68; Compagnie Financiere, 232 F.3d at 158) (internal quotation marks and citations omitted).

Constr. Co., 2 N.Y.2d 456, 459 (1957)); Palmieri, 445 F.3d at 187 ("The mere assertion of an

ambiguity does not suffice to make an issue of fact.") (quoting Thompson v. Gjivoje, 896 F.2d

716, 721 (2d Cir. 1990)).

A.    **CLAIMS WHERE SUMMARY JUDGMENT IS APPROPRIATE**

   1.    **Quarterly Reports**

Plaintiff claims that Defendant breached this contractual obligation by failing to provide

Plaintiff with any quarterly reports after December 31, 2004.  Defendant admits this failure, but

asserts that it performed all outstanding obligations under the UAA.  Ex. 6, at 37-38; Ex. 3, ¶¶

40, 44; Appendix of Undisputed Facts Admitted by GSNIC, ¶ 57.  Defendant contends that the

commutation transaction extinguished a significant portion of Plaintiff's portfolio of business,

leaving no further incurred loss data to report.  Defendant also contends that it continued to

provide Plaintiff with incurred losses data on various occasions – namely, in July 2005,

September 2005, October 2005, and April 2008.  Supplemental Declaration of Caroline A.

Morgan, Ex. R, Ex. 13; Ex. 2, at 493-498; Morgan Supp. Decl, Ex. S, Ex. 20; Declaration of

Elliott Kroll, Ex. 4.  Plaintiff does not dispute that it received loss data on the aforementioned

dates, but rather takes issue with the timeliness of Defendant's performance.  Article IV of the

UAA is a clear and unambiguous provision that requires Defendant to provide Plaintiff on a

quarterly basis with incurred losses data for Plaintiff's portfolio of business.  Defendant's

undisputed failure to provide incurred loss data in the form of quarterly reports after December

2004 constitutes a breach of the UAA, unless the evidence can demonstrate that the provision at

issue was waived by Plaintiff.

"Contractual rights may be waived if they are knowingly, voluntarily and intentionally

abandoned." Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P., 7 N.Y.3d

96, 104 (2006). "[W]aiver of a contractual right 'may be established by affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage . . . and must be based on a clear manifestation of intent to relinquish a contractual protection.'" Natale v. Ernst, 881 N.Y.S.2d 232, 233 (N.Y. App. Div. 2009) (quoting Portfolio Advisors, 7 N.Y.3d at 104); accord Capitol Records, Inc. v. Naxos of Am., Inc., 372 F.3d 471, 482 (2d Cir. 2004); see also Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) (citation omitted). "A waiver is not created by negligence, oversight, or thoughtlessness, and cannot be inferred from mere silence." Golfo v. Kycia Assoc., Inc., 845 N.Y.S.2d 122, 124 (N.Y. App. Div. 2007) (citation omitted). Waiver "generally presents a question of fact." Natale, 881 N.Y.S.2d at 233; accord Portfolio Advisors, 7 N.Y.3d at 104. "[T]he existence of a nonwaiver clause does not in itself preclude waiver of a contract clause." Dice v. Inwood Hills Condominium, 655 N.Y.S.2d 562, 562-63 (N.Y. App. Div. 1997) (citing TSS-Seedman's, Inc. v. Elota Realty Co., 72 N.Y. 2d 1024, 1029 (1988)); see, e.g., Wyeth v. King Pharms., Inc., 396 F. Supp. 2d 280, 290 (E.D.N.Y. 2005) (referencing Town of Hempstead v. Incorporated Village of Freeport, 15 A.D.3d 567, 790 (N.Y. App. Div. 2005)).[20]

A reasonable jury would be compelled to find that Plaintiff waived its right to receive quarterly reports. The evidence overwhelmingly indicates that Plaintiff failed to require performance of the quarterly report provision over a period of years. Plaintiff accepted and was presumably content with Defendant's sparse productions of losses data, even though it was outside of the quarterly report framework. Plaintiff has not produced any evidence demonstrating that it ever inquired into the whereabouts of the quarterly reports, or informed Defendant that it wished to receive them over the period of years that Defendant repeatedly

---

[20] The Termination Agreement contains such a provision. Ex. 19, ¶ 10.

failed to comply with the requirement.[21]  Plaintiff has thus failed to create a triable issue over

whether Plaintiff maintained its right to quarterly reports.  A reasonable jury could find based on

this record that the parties engaged in conduct demonstrative of a mutual agreement waiving the

quarterly reports.  There is no evidence, however, from which a reasonable jury could find that

Plaintiff did not waive its right to quarterly reports.  Plaintiff cannot unilaterally reinstate that

right to attempt to recover damages.  Accordingly, Defendant's conduct did not breach the UAA.

### 2.    IBNR Consultation

Section F of the CCA is a clear and unambiguous term that required Defendant to

"establish[]" IBNR for the contingency commission calculation "after consultation" with

Plaintiff.  The CCA does not specify the manner in which the parties should or must consult.

This absence, however, does not render the provision ambiguous.  See Greenfield v. Philles

Records, 98 N.Y.2d 562, 573 (2002) ("[S]ilence does not equate to contractual ambiguity.")

(citations omitted).  Nor, under the present circumstances, does this absence provide a basis to

conclude that the contract is incomplete or "inherently ambiguous as to some issue material to

defining the relationship between the parties." Chen-Oster v. Goldman, Sachs & Co., 2010 U.S.

Dist. LEXIS 141813, at *9-10 (S.D.N.Y. Mar. 1, 2010) (citations omitted); see also Reiss v. Fin.

Performance Corp., 97 N.Y.2d 195, 199 (2001) ("[T]his Court will not imply a term where the

circumstances surrounding the formation of the contract indicate that the parties, when the

contract was made, must have foreseen the contingency at issue and the agreement can be

enforced according to its terms.") (citation omitted).  Based on the plain-meaning of the term

---

[21]  Although not relied upon in response to Defendant's argument, Plaintiff did allege in its Rule 56.1
Statement in Support of its Motion for Partial Summary Judgment that it "protected the failure to provide
information."  ¶ 58 (citing Ex. 21; Ex. 22).  The cited correspondence, however, seeks only copies of the
commutation agreements and makes no reference to or request for copies of quarterly reports.

"consultation" – i.e the act of conferring or comparing views – Defendant complied with Section F of the CCA so long as Plaintiff had an opportunity to be heard before and to invoke its right to a calculation by an independent actuary before Defendant finalizes the amount of the contingency commission calculation owed to Plaintiff.[22]

Plaintiff claims that Defendant violated the CCA by failing to consult with Plaintiff prior to establishing IBNR for the commutation transactions. Defendant admits that it engaged in no such consultation. Nevertheless, Defendant's conduct did not breach the CCA. Section F imposes a IBNR consultation requirement only on Defendant's calculation of the contingency commission payments. Neither that provision, nor any other provision in the CCA, references other situations where a IBNR consultation is required. Absent such an obligation, Plaintiff cannot establish a breach based upon Defendant's failure to consult during the commutation transactions.

Plaintiff also claims that Defendant violated the CCA by failing to consult with Plaintiff prior to establishing IBNR for the contingency commission calculation performed in 2008. Defendant has produced evidence of extensive communications between the parties.[23] By letter dated February 15, 2008, Defendant advised Plaintiff that it was in the process of calculating the contingent commission and that Plaintiff was welcome to provide Defendant with whatever

---

[22] Plaintiff's interpretation that Section F required Defendant to consult with Plaintiff prior to performing any calculation under the CCA is wholly unsupported by the plain language of that provision. It is thus rejected. This Court is not at liberty to impose new requirements on Defendant. Plaintiff's dissatisfaction with how Defendant chose to "consult" creates neither ambiguity in the contract nor a triable issue as to breach. Furthermore, Plaintiff had a remedy available at that time that it never exercised – requesting a calculation by an independent actuary.

[23] To the extent that Plaintiff had concerns about the IBNR established by Defendant, the contract provided Plaintiff a remedy (i.e. right to a calculation by an independent actuary). Having never made an effort to invoke that right, despite having an opportunity to do so, it is both awkward and improper for Plaintiff to now attack the IBNR calculation and the procedural sufficiency of the "consultation" as grounds for a breach of contract claim arising under Section F.

properly documented premium information it had available.  Declaration of Caroline A. Morgan, Ex. G; Kroll Decl. ¶ 2.  By email dated February 20, 2008, Defendant advised Plaintiff that it would be sending "[it]'s actuarial projections" and invited Plaintiff "[c]onsistent with the terms of these Addendums . . . to attend . . . a 'without prejudice' meeting . . . to consult on the IBNR in the hopes of agreeing upon the calculations or narrowing the difference if any."  Kroll Decl., Ex. 1; Kroll Decl. ¶¶ 2, 4.  By email dated February 21, 2008, Plaintiff agreed to schedule a meeting and stated that it would send its own calculations for Defendant to review before the meeting.  Kroll Decl., Ex. 2; Kroll Decl. ¶ 3.  Plaintiff requested paid loss data and other information during March 2008, all of which was provided to Plaintiff.  Kroll Decl. ¶¶ 5-7; Kroll Decl., Ex 3-5.

A meeting was held between the parties on April 17, 2008.  Kroll Decl. ¶ 10.  Plaintiff was represented by counsel, two executives, and its actuary.  Kroll Decl. ¶ 10.  Defendant was represented by counsel, its actuary, and the employee who performed the contingent commission calculation.  Kroll Decl. ¶ 10.  Plaintiff raised a question regarding differences between the last quarterly report it received in 2004 and the loss data provided by Defendant in 2008, and after the meeting Defendant produced the relevant loss information.  Kroll Decl. ¶¶ 11-12; Ex. 8.  The parties communicated about the loss data, but after May 2, 2008, Defendant received no further communications from Plaintiff until the instant lawsuit was filed in August 2008.  Kroll Decl. ¶¶ 13-14; Kroll Decl., Ex. 9.

Plaintiff has not produced any evidence disputing that any of the aforementioned events occurred, or more importantly that it had no communications with Defendant about IBNR.  Defendant's undisputed evidence demonstrates that Defendant did in fact consult with Plaintiff about IBNR before finalizing the calculation for the contingency commission.  Plaintiff's focus

15

on the fact that Defendant prepared a preliminary calculation for itself before reaching out to

Plaintiff does not create a material dispute over whether Defendant consulted.  Also insufficient

to create a material dispute is Plaintiff's insistence that Defendant's method of consultation was

inadequate or a sham, given that the CCA imposes no requirements on how Defendant must

consult, or the fact that one of Plaintiff's representatives in attendance on the April 17, 2008, did

not understand the meeting to be an official IBNR consultation meeting.  Ex. 2, at 150.  Based on

this evidence, no reasonable jury could find that Plaintiff was not consulted about IBNR or that

Defendant did not satisfy its obligation under Section F of the CAA.  Accordingly, Defendant's

conduct did not breach the CCA.

### 3.    Commutation Loss Allocation

 Although Plaintiff initially claimed that Defendant violated the CCA by commuting a

substantial portion of Plaintiff's portfolio of business, Plaintiff now claims that Defendant

violated the CCA by including the commutation payments in the contingent commission

calculation.  Plaintiff contends that the inclusion was not permitted by the CCA because the

contract contains no reference to commutations.  Plaintiff also contends that the inclusion was

not permitted by the CCA because there is no category in the formula for the contingent

commission calculation that allows Defendant to allocate a portion of the losses incurred as a

result of the commutation, without verifying what losses were attributable to Plaintiff-produced

certificates.  The only evidence that Plaintiff relies upon, aside from the CAA, are the undisputed

facts that Defendant commuted Plaintiff-produced certificates, Plaintiff-produced certificates

were only a small percentage of all certificates commuted, Defendant negotiated a commutation

price based on Defendant's entire book of business, and Defendant allocated losses on a contract

basis.  Defendant's Response to Plaintiff's Statement of Undisputed Facts ¶¶ 100, 102, 107-110,

112.

Section A of the CCA sets forth in a clear and unambiguous fashion the formula that Defendant must use to calculate the contingency commission. The formula plainly states in Section A.2 that, in computing net profits, a deduction is made for "losses . . . paid by [Defendant] . . . arising from facultative certificates bound or written with effective dates during the Underwriting Year under calculation." Although the formula does not specifically reference commutation transactions, the only evidence in the record on commutation indicates that commutations generally result in losses and that, in this instance, the commutation transactions did in fact result in actual losses paid by Defendant. Beerman Aff. ¶¶ 7, 10; Beerman Aff., Ex. 1; Ex. 1, at 266. Plaintiff has set forth no factual or legal support indicating that, despite the plain-language of Section A.2, commutation losses should have been excluded from Section A.2. It was thus not a violation of the CCA for Defendant to use losses resulting from the commutation transactions in calculating Plaintiff's contingency commission.[24]

Additionally, Defendant's method for allocating losses resulting from the commutation transactions was not a violation of the CCA. The CCA not only makes no reference to commutation transactions, but also makes no reference to the proper method to account for losses from such transactions. Absent controlling contractual provisions in the CCA, or legal standards, Plaintiff's argument amounts to nothing more than a mere disagreement with

---

[24] Notably, had Defendant not engaged in the commutation transactions, the reserves (both claims and IBNR) on the commuted reinsurance certificates for the contingent commission calculation would most certainly have been greater than the amounts paid by Defendant in the commutation transactions, resulting in even greater net losses than the $56 million losses actually suffered. This is because in all case, the amounts paid by Defendant in the commutation transactions were less than the carried reserves for the commuted certificates. Beerman Aff. ¶ 10. This is in part because the commutation price is based on a "discounted" value of carried reserves, and under the contingent commission calculation, the reserves are calculated on an "undiscounted" basis. Ex. 10, ¶ A.3. In other words, the commutation transactions reduced "net losses" for Plaintiff, and Plaintiff cannot demonstrate that it was harmed. Plaintiff has produced no evidence to the contrary.

Defendant's methodology. That is insufficient to sustain a claim for breach of contract. Moreover, Defendant has set forth evidence that its method did differentiate between the profitability of Plaintiff's produced certificates and all other commuted certificates – namely, by allocating the commutation price to each commuted certificate proportionally based on its carried reserves at the time of the commutations. Morgan Supp. Decl., Ex. U, at 13-14; Morgan Supp. Decl., Ex. O, Ex. 16. Accordingly, Defendant's conduct did not breach the CCA.

### 4.    Contingency Commission Calculation

Plaintiff claims that Defendant violated the Termination Agreement by continuing to carry forward deficits in the contingency commission calculation. Plaintiff contends that the CCA provision that permitted this practice was eliminated by the Termination Agreement, and thus Defendant's calculation is erroneous. It is undisputed that Defendant performed the contingency calculation by applying a carry forward deficit through all of the underwriting years under consideration. Beerman Aff., Ex. 1.

Section 3(a) of the Termination Agreement is a clear and unambiguous term that required the contingent commissions "be calculated . . . as set forth in the Contingency Commission Addendum." Section 3(a) further required a modification from the CCA as to when the contingency commission should be calculated, stating that "calculations shall be made individually for each respective underwriting year between January 1, 2008 and February 29, 2008." Section 7, which governs provisions that survive termination of that agreement, is a clear an unambiguous term that provided that "the Contingent Commission Addendum shall for purposes of Section 3 of this Termination Agreement survive the termination of the Underwriting Agreement." The Termination Agreement contains no other language implicating the carry forward deficit. Thus, under the plain-language of the applicable provisions, it was

appropriate for Defendant to continue applying a carry forward deficit in 2008 when it

performed the contingency calculation for underwriting years 1997-2001 and a prorated portion

of 2002. Accordingly, Defendant's conduct did not breach the Termination Agreement.[25]

**B.    SUMMARY JUDGMENT IS NOT APPROPRIATE FOR DATA QUALITY**

      **1.    Material Dispute Exists Over Breach**

Defendant maintained claim data in its Omega computer system, and retained the sole

responsibility for verifying the accuracy of the information on its reinsurance certificates. Ex. 1,

at 63; Ex. 4, at 37; Ex. 15, at 153-154; Ex. 29, at 12-14. Section D of the CCA is a clear and

unambiguous term that expressly required Defendant to calculate the contingency commission

based upon its records, and thus not use erroneous data in connection with the contingent

commission calculation.

Plaintiff contends that Defendant breached this obligation because erroneous claims data

polluted GSNIC's calculation of reserves, on both known and unknown claims, because in

calculating reserves, GSNIC relies on claims data. Ex. 4, at 30-31, 34. Plaintiff relies on an

internally-produced Audit Memo that was produced in 2005, around the time that Defendant

commuted a substantial portion of Plaintiff's portfolio of business. Ex. 23. In 2005, certain

employees of SCOR Paris reviewed Defendant's claim administration procedures and certain of

its claim files. Ex. 23, at 1, 3; Ex. 15, at 271-273. The Audit Memo stated that "Omega is not

properly updated and cannot give a true image of the claims portfolio" and is "incomplete." Ex.

---

[25] Notably, Defendant's calculation of the contingent commission also calculated net profits without the deficit carry-forward. The calculations demonstrate that there were no net profits in any underwriting year whether or not the deficit carry-forward is applied. Beerman Aff., Ex. 1. The unmodified terms of the CCA clearly state that Plaintiff is not entitled to a contingent commission "for any underwriting year in which [Defendant] experiences no annual net profit or a deficit." Ex. 10, ¶ A. In other words, the calculation resulted in zero net profits from which Plaintiff was entitled to receive 30% regardless of the carry-forward provision.

23, at 7, 8.  The Audit Memo also stated that: "A very large number of the files (30%) are not

sufficiently documented to validate a claim or to build up a defence[sic] against unfounded

claims. Scor depends too much on materials provided by outsiders such as brokers."  Ex. 23, at

14.  Various SCOR employees were already aware of some of the issues outlined in the 2005

Claims Audit Memo.  Ex. 24, at 9, 10, 134-136, 139, 147, 149, 153; Ex. 15, at 272-273, 276-277;

Ex. 25, July 20, 2005 Email from Victor Peignet to SCOR Employees.  Plaintiff also relies on

the opinion of a purported actuarial expert that the Acumen Re claim file does not support

Defendant's contingent commission calculation, and that the records produced were not

adequately maintained to allow anyone to make the contingent commission calculation.  Morgan

Decl., Ex. E, Expert Report of Ricardo Verges; Ex. P, Deposition of Ricardo Verges.

    Defendant denies that its claims data was not sufficiently documented, contending that

the audit's conclusion was a snapshot of a random sample of claims and does not reflect the

status of claims in 2008.[26]  Ex. 24, at 133-134; Supplemental Declaration of Caroline A. Morgan,

Ex. T, Gerrity Dep., at 125-127.  Defendant relies upon the following evidence: (a) deposition

testimony about the limited purpose and scope of the Audit Memo; (b) deposition testimony that

Audit Memo was merely a snapshot and not indicative of widespread problems; (c) findings of

the Insurance Department of the State of New York in 2007 that data was accurate; (d) detailed

---

[26]  In response to Plaintiff's allegations regarding the 2005 Audit Memo, Defendant has submitted an audit
conducted by the Insurance Department of New York pursuant to N.Y.S. Ins. Law, § 307.  Morgan Decl., Ex. C,
Report on Examination of Defendant as of December 31, 2006.   The 2006 audit covered the five-year period from
January 1, 2002 through December 31, 2006.  Morgan Decl., Ex. C, at 2.  The examination comprised a verification
of assets and liabilities as of December 31, 2006, which included a verification of transactions completed during the
period relating to, amongst other things, income and disbursements.  Morgan Decl., Ex. C, at 2.  In the report, the
auditors determined that data Defendant had filed in its annual financial statement was "found to accurately reflect
its reinsurance transactions."  Morgan Decl., Ex. C, at 7.  The report further confirmed that, in regard to reserves,
"the analysis of the loss and loss adjustment expense reserves was conducted in accordance with generally accepted
actuarial principles and was based on statistical information contained in the Company's internal records . . . ."
Morgan Decl., Ex. C, at 16.

spreadsheets for each claim paid by contract year; (e) testimony about the implementation of

data quality requirements subsequent to the Audit Memo which cured most, if not all of, the

deficiencies; and (f) testimony by Defendant's witnesses that disagreed with the findings of

Plaintiff's expert.  Thus, a dispute exists over whether Defendant properly maintained its records

on Plaintiff's portfolio of business.  This is a triable issue of fact that is appropriate for a fact-

finder to resolve.

### 2.    Compensatory or Expectation Damages[27]

"Causation is an essential element of damages in a breach of contract action; and, as in

tort, a plaintiff must prove that a defendant's breach directly and proximately caused his or her

damages." Diesel Props S.r.l., 631 F.3d at 52-53 (citation and quotation marks omitted).

"[D]amages . . . 'must be not merely speculative, possible, and imaginary, but they must be

*reasonably* certain and such only as actually follow or may follow from the breach of the

contract.'" Tractebel Energy Mktg. v. AEP Power Mktg., 487 F.3d 89, 110 (2d Cir. 2007)

(quoting Wakeman v. Wheeler & Wilson Mfg. Co., 4 N.E. 264, 266 (1886) (emphasis added));

see also Nat'l Mkt. Share, Inc. v. Sterling Nat'l Bank, 392 F.3d 520, 525-26 (2d Cir. 2004).

"'Certainty,' as it pertains to general damages, refers to the fact of damage, not the amount."

Tractebel, 487 F.3d at 110 (citing Wakeman, 4 N.E. at 266).

"[D]amages for breach of contract should put the plaintiff in the same economic position

he would have occupied had the breaching party performed the contract." Id. at 384-85 (quoting

Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003)); id. at 391 ("[T]he

amount of damages must put the non-breaching party in as a good a position as if the breach had

---

[27]  Even if a triable issue existed regarding any of the dismissed breach of contract claims, Plaintiff has not
produced evidence of a loss to be entitled to compensatory damages.

not occurred"). "[D]amages are calculated at the time of the breach." Boyce v. Soundview Tech. Group, Inc., 464 F.3d 376, 384 (2d Cir. 2006) (citing Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 262-63 (2d Cir. 2002); other citations omitted). "[T]he burden of uncertainty as to the amount of damage is upon the wrongdoer." Tractebel, 487 F.3d at 110 (quoting Contemporary Mission, Inc. v. Famous Music Corp., 557 F.2d 918, 926 (2d Cir. 1977)). "The plaintiff need only show a 'stable foundation for a reasonable estimate' of the damage incurred as a result of the breach." Id. at 110-111 (citations omitted); accord Schonfeld v. Hilliard, 218 F.3d 164, 182 (2d Cir. 2000).

Even if a reasonable jury finds in Plaintiff's favor on liability for the data quality breach of contract claim, Plaintiff must be able to offer evidence of the damages that it incurred as a result of that breach. Plaintiff has failed, however, to go beyond its conclusory, speculative assertions to set forth with reasonable certainty evidence of some demonstrable harm. The record lacks any evidence regarding what its contingent commission payment should have been (i.e. the actual profitability of its portfolio of business), and discovery is now closed. Plaintiff's previously discussed evidence of breaching conduct by Defendant does not establish that Plaintiff suffered actual damages. Accordingly, Plaintiff has not demonstrated that it is entitled to recover compensatory damages on the data quality breach of contract claim. See J. A. Weitzman, Inc. v. Lerner, Cumbo & Assoc., Inc., 2007 NY Slip Op 10106, 2 (N.Y. App. Div. 2007) ("In the absence of injury, the plaintiff cannot sue for damages, nor may he seek equitable redress, 'because there is nothing to redress.") (citations and internal quotation marks omitted).

### 3.     Nominal Damages

Plaintiff's failure to prove compensatory damages would not, however, entitle Defendant to summary judgment on this claim. That damages are uncertain, or may not even exist, is an

insufficient reason under New York law to grant Defendant's motion for summary judgment.

"[I]t is a well-settled tenet of contract law that even if the breach of contract caused no loss or if the amount of loss cannot be proved with sufficient certainty, the injured party is entitled to recover as nominal damages a small sum fixed without regard to the amount of the loss, if any." Hirsch Elec. Co. v. Cmty. Servs., Inc., 145 A.D.2d 603, 605 (N.Y. App. Div. 1988) (citation omitted); accord T & N PLC v. Fred S. James & Co. of N.Y., Inc., 29 F.3d 57, 60 (2d Cir. 1994) ("[N]ominal damages are always available for breach of contract."); Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 95 (1993) ("Nominal damages are always available in breach of contract actions[.]"); Freund v. Washington Square Press, Inc., 34 N.Y.2d 379, 384 (1974) (plaintiff entitled to nominal damages where compensatory damages not proven with certainty; "Though these are damages in name only and not at all compensatory, they are nevertheless awarded as a formal vindication of plaintiff's legal right to compensation which has not been given a sufficiently certain monetary valuation."); Manhattan Sav. Inst. v. Gottfried Baking Co., 286 N.Y. 398, 400 (1941) (same); C.K.S. Ice Cream Co. v. Frusen Gladje Franchise, Inc., 172 A.D.2d 206, 208 (N.Y. App. Div. 1991) ("Even if it were shown that no actual damages have been sustained, plaintiff would seem entitled to proceed to trial at least on its contract cause of action[,] if only to vindicate its right to nominal damages.") (citations omitted); Good Karma Prods. v. Penthouse Int'l, Ltd., 450 N.Y.S.2d 486, 486-87 (N.Y. App. Div. 1982). This is because "whenever there is a breach of a contract or the invasion of a legal right[,] the law infers some damage." Finley v. Atlantic Transp. Co., 220 N.Y. 249, 258 (1917); see, e.g., Maalouf v. Citigroup Global Mkts., Inc., 156 Fed. Appx. 367, 369 (2d Cir. 2005); Versatile Housewares & Gardening Sys. Inc. v. Thill Logistics, Inc., 2011 U.S. Dist. LEXIS 71444, at *14-15 (S.D.N.Y. June 27, 2011). Accordingly, Plaintiff may proceed to trial on its quality data breach of contract

claim, even if the claim is limited to nominal damages.

## **CONCLUSION**

Plaintiff's motion for summary judgment is DENIED in its entirety.  Defendant's motion for summary judgment is DENIED with respect to the data quality breach of contract claim. Defendant's motion for summary judgment is GRANTED with respect to the quarterly reports, IBNR consultation, commutation loss allocation, and carry forward deficit breach of contract claims.  These claims are dismissed.


Dated: New York, New York
        September 7, 2012

                                        SO ORDERED:

                                        _____
                                        GEORGE B. DANIELS
                                        United States District Judge